# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 16, 2022      Decided June 25, 2024

No. 21-5263

MAXWELL GOODLUCK, ET AL.,
APPELLEES

v.

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES OF AMERICA, ET AL.,
APPELLANTS

Consolidated with 21-5270, 21-5271, 21-5272, 21-5277, 21-5288

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-01530)
(No. 1:21-cv-01874)
(No. 1:21-cv-00943)
(No. 1:21-cv-02228)
(No. 1:21-cv-02033)
(No. 1:21-cv-02071)
(No. 1:21-cv-00999)

2

*Cara E. Alsterberg*, Trial Attorney, U.S. Department of Justice, argued the causes for appellants/cross-appellees. With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *William C. Bateman, III*, *Anna L. Dichter*, *Michelle M. Ramus*, *Eric C. Steinhart*, *James J. Wen*, and *William H. Weiland*, Trial Attorneys.

*Jesse M. Bless* and *Rafael Urena* argued the causes for appellees. With them on the joint brief were *Laboni A. Hoq*, *Stephen W. Manning*, *Andrew J. Pincus*, *Carmen N. Longoria-Green*, *Karen C. Tumlin*, *Esther H. Sung*, *Charles H. Kuck*, *Nicolette Glazer*, and *Curtis Lee Morrison*. *Jennifer R. Coberly* entered an appearance.

*Charles H. Kuck* argued the cause and filed the brief for appellees/cross-appellants.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: In these four consolidated appeals, district courts held that the Department of State had unlawfully suspended, deprioritized, and delayed the processing of applications for diversity visas for fiscal years 2020 and 2021, at the height of the COVID-19 pandemic. As a remedy, the courts ordered the Department to continue processing applications and issuing visas after the statutory deadlines for doing so had passed. We hold that the courts lacked authority to order this relief.

3

I

A

The Immigration and Nationality Act creates an annual allotment of immigrant visas for aliens from countries with low rates of immigration to the United States. 8 U.S.C. § 1153(c). These visas are known as diversity visas. Congress capped the number of diversity visas at 55,000 per fiscal year. *Id.* § 1151(a)(3), (e).

The State Department administers the diversity-visa program annually. Before the start of each fiscal year, it holds a lottery for applicants from qualifying countries. 22 C.F.R. § 42.33. Millions of individuals apply. *See* Bureau of Consular Affairs, U.S. Dep't of State, Diversity Visa Program, DV 2019-2021: Number of Entries During Each Online Registration Period by Region and Country of Chargeability. From among these applicants, the Department randomly selects a number that it estimates will ensure filling the authorized diversity visas "for the fiscal year in question." 22 C.F.R. § 42.33(c). Selectees become "eligible" to receive such visas "for the fiscal year involved." 8 U.S.C. § 1153(e)(2).

Selectees do not automatically receive visas. Rather, they must submit a full, written application for an immigrant visa and must personally appear for an interview before a consular officer. *See* 22 C.F.R. §§ 40.1(*l*)(2), 42.33(g). They must satisfy all admissibility requirements. *See* 8 U.S.C. § 1182(a). They must also complete the application process and receive a visa before "the end of the specific fiscal year for which they were selected." *Id.* § 1154(a)(1)(*I*)(ii)(II).

Selectees who timely complete the application process may receive immigrant visas, provided that the annual cap of 55,000 visas is not exceeded. *See* 8 U.S.C. §§ 1151(a)(3),

4

1151(e), 1201(a)(1)(A).  They then may travel to the United States and seek admission.  *Id.* § 1181(a).  Like any other visa, a diversity visa does not guarantee admission; instead, it "merely gives the alien permission to arrive at a port of entry and have an immigration officer independently examine the alien's eligibility for admission."  *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999); *see* 8 U.S.C. § 1201(h).

B

The COVID pandemic significantly hampered the State Department's administration of the diversity-visa program.

Section 1182(f) of Title 8 permits the President to "suspend the entry of all aliens or any class of aliens" whenever he finds that their entry "would be detrimental to the interests of the United States."  In April 2020, President Trump issued Proclamation 10014, which suspended the entry of aliens to protect domestic labor markets harmed by the pandemic.  85 Fed. Reg. 23,441 (Apr. 27, 2020).  President Trump twice extended Proclamation 10014, but President Biden revoked it in February 2021.  85 Fed. Reg. 38,263 (June 25, 2020); 86 Fed. Reg. 417 (Jan. 6, 2021); 86 Fed. Reg. 11,847 (Mar. 1, 2021).  During the ten months when the Proclamation remained in effect, the State Department declined to issue diversity visas.  The Department took the position that a section 1182(f) proclamation, by rendering covered aliens inadmissible, also renders them ineligible for visas.

Around the same time, the Department also issued its own guidance instructing consular officers how to respond to COVID.  In March 2020, the Department suspended all "routine visa services"—including the processing of applications for diversity visas—but permitted certain "mission-critical visa services" to continue.  J.A. 411.  The Department re-established more visa services over the summer,

5

but the pandemic hampered its efforts to reduce backlogs in pending applications. In November 2020, the Department instructed consular posts to follow a four-tiered prioritization scheme for addressing the backlog, with diversity visas in the lowest-priority tier. J.A. 2281–84. The Department rescinded this guidance one year later.

C

The plaintiffs in these cases are selectees in the FY 2020 and 2021 diversity-visa lotteries. They contend that the State Department policies noted above unlawfully prevented them from receiving visas before the fiscal-year-end deadlines. The district courts largely agreed. As a remedy, the courts ordered the Department to prioritize processing and issuing diversity visas past the end of the fiscal years.

The *Gomez* plaintiffs—a class of FY 2020 diversity-visa selectees—sued in May 2020. On September 4, 2020, the district court granted a preliminary injunction. *Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) (*Gomez I*). At the outset, the court held that the doctrine of consular non-reviewability does not foreclose judicial review of the claims at issue. *Id.* at 175–76. On the merits, the court first held that a section 1182(f) proclamation likely does not make covered aliens ineligible to receive visas. *See id.* at 191–94. Then, it held that the Department likely had unreasonably delayed processing the plaintiffs' visa applications. *Id.* at 195–98. Finally, it held that the Department's guidance likely was arbitrary because it did not adequately explain the exclusion of diversity-visa processing from mission-critical services. *Id.* at 198–99. The court stayed the Department's policy, ordered the Department to "undertake good-faith efforts" to "expeditiously process and adjudicate DV-2020 diversity visa and derivative beneficiary applications," and enjoined the Department from

6

directing consular personnel not to consider the diversity program "mission critical." *Id.* at 205.

On September 30, 2020—the last day of the fiscal year—the court granted "supplemental equitable relief" ordering the Department to "reserve" FY 2020 diversity visas for processing and issuance after the end of the fiscal year. *Gomez v. Trump*, 490 F. Supp. 3d 276, 283 (D.D.C. 2020) (*Gomez II*). The court ordered the Department to hold open 9,095 visas past the fiscal year-end—a number it viewed as a "reasonable estimate" of how many additional visas the Department would have issued but for the policies that it found likely to be unlawful. *See id.* at 288–90. Later, the court granted summary judgment to the selectees and ordered the Department to process their visa applications in a random order until it granted all the reserved visas—and to finish the processing by September 30, 2022. *See Gomez v. Biden*, No. 20-cv-01419, 2021 WL 3663535, at *24 (D.D.C. Aug. 17, 2021) (*Gomez III*); J.A. 2342. The Department appealed, and the district court stayed its order pending resolution of the appeal.

The *Goodluck*, *Goh*, and *Rai* cases followed a similar pattern with FY 2021 selectees as plaintiffs. Each group of plaintiffs sued between March and June 2021. In each case, the district court followed the substantive and remedial rulings in *Gomez*. *See* J.A. 1531 (reserving 6,914 visas in *Goodluck* and 481 visas in *Goh*); J.A. 1424 (reserving 966 visas in *Rai*).

The Department appealed each case, and we consolidated the four appeals. By cross-appeal, the *Goh* plaintiffs argued that the district court should have reserved more visas for them.

II

On appeal, the parties debate at length the lawfulness of how the State Department responded to Proclamation 10014

7

and more generally to the pandemic. The plaintiffs argue, and the district courts held, that (1) a section 1182(f) proclamation prevents entry into the United States but does not prevent the issuance of visas; (2) the State Department guidance was arbitrary; and (3) the Department unreasonably delayed the processing of their visa applications. The government contests these points. We need not resolve any of them because a fourth contested issue is dispositive: The district courts had no authority to require the Department to issue diversity visas past the applicable statutory deadlines.

A

A court granting the equitable remedy of an injunction has discretion to "mold its decree to meet the exigencies of the particular case." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (quoting 11A Wright & Miller, *Federal Practice and Procedure* § 2947 (3d ed. 2013)). But this discretion has limits. One is that courts cannot order relief that conflicts with a clear and constitutionally valid statute. *See*, *e.g.*, *Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893) ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."); *Rees v. City of Watertown*, 86 U.S. (19 Wall.) 107, 122 (1874) ("A court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law ….").[1] Another limit is that, unless Congress expressly provides otherwise, equitable remedies must track remedies traditionally afforded by the equity courts. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999).

---

[1] Because the plaintiffs here assert no constitutional claims, we do not address equitable remedies for constitutional violations.

8

Two cases highlight these points. *INS v. Pangilinan*, 486 U.S. 875 (1988), involved a statute that made citizenship available to aliens who had served in the United States military during World War II, but only if they filed naturalization petitions by December 31, 1946. *Id.* at 877–80. The plaintiffs were Filipino nationals who had met the service requirement but not filed timely petitions. *See id.* at 880–82. They argued that for nine months before the statutory deadline, the United States had unlawfully refused to appoint anyone in the Philippines with authority to accept and process the required petitions. *See id.* The Ninth Circuit agreed. *See id.* at 882. Then, it asserted an "equitable authority to craft a remedy" requiring the government to confer citizenship on the plaintiffs despite the 1946 cutoff. *Id.* at 883.

The Supreme Court unanimously reversed this remedial ruling. It stressed the longstanding principle that "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Pangilinan*, 486 U.S. at 883 (quoting *Hedges*, 150 U.S. at 192). Moreover, it reasoned, Congress had not conferred on the federal courts "the power to make someone a citizen of the United States," unlike other expressly conferred equitable powers "like mandamus or injunction." *Id.* at 883–84. Thus, the Ninth Circuit had erred by disregarding "the explicit cutoff date" in the statute and ordering the conferral of citizenship anyway. *Id.* at 884; *see also id.* at 885 ("Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations.").

*Grupo Mexicano* confirmed that equitable remedies must be historically grounded absent express expansion by Congress. As the Supreme Court explained, the federal courts' general power to hear equitable claims is "an authority to

9

administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." 527 U.S. at 318 (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939)). Thus, the "prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief … depend on traditional principles of equity jurisdiction." *Id.* at 318–19 (quoting 11A Wright & Miller, Federal Practice & Procedure § 2941, at 31 (2d ed. 1995)). Of course, Congress may authorize new remedies in "departure from past practice," so long as the remedies are consistent with Article III. *Id.* at 322. But absent such clear legislative action, courts considering an equitable remedy "must ask" whether it "was traditionally accorded by courts of equity." *Id.* at 319.

B

The remedy ordered here—instructing the Executive Branch to reserve, process, and issue visas on terms devised by the courts—is irreconcilable with these settled principles.

Most obviously, it conflicts with the governing statutes. As noted above, selectees in the diversity-visa lottery become "eligible" to receive visas "for the fiscal year involved." 8 U.S.C. § 1153(e)(2). Moreover, selectees "shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." *Id.* § 1154(a)(1)(*I*)(ii)(II). And "[n]o visa or other documentation shall be issued to an alien" if "the consular officer knows or has reason to believe that such alien is ineligible to receive a visa." *Id.* § 1201(g). State Department regulations confirm these statutory limits: "Under no circumstances may a consular officer issue a visa or other documentation to an alien after the end of the fiscal year during which an alien possesses diversity

10

visa eligibility." 22 C.F.R. § 42.33(a)(1). In other words, "when midnight strikes at the end of the fiscal year, those applicants without visas are out of luck." *Yung-Kai Lu v. Tillerson*, 292 F. Supp. 3d 276, 282 (D.D.C. 2018). Or as the *Gomez* court acknowledged, "[s]ection 1154 sets an absolute, unyielding deadline by which selectees must receive their visas." *Gomez I*, 485 F. Supp. 3d at 196. And "this strict interpretation of the diversity visa statute has been adopted by every circuit court to have addressed the issue." *Yung-Kai Lu*, 292 F. Supp. 3d at 282 (citing cases from the Second, Third, Seventh, Ninth, and Eleventh Circuits).[2] The district courts here thus made the same error as the Ninth Circuit in *Pangilinan*—invoking a supposed equitable power to override an "explicit cutoff date" established by Congress. *See* 486 U.S. at 884.

Historical and contextual considerations also warrant restraint. The Supreme Court has long held that "any policy toward aliens is vitally and intricately interwoven with" both "the conduct of foreign relations" and "the war power"—and so is "largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). More particularly, it is "not within the province of any court,

---

[2] *See Coraggioso v. Ashcroft*, 355 F.3d 730, 734 (3d Cir. 2004) ("The phrase 'only through the end of the specific year' unambiguously indicates Congress's intent to impose a time deadline on an applicant's eligibility …."); *Nyaga v. Ashcroft*, 323 F.3d 906, 914 (11th Cir. 2003) ("the phrase 'shall remain eligible to receive such visa' plainly means that aliens … who have been randomly selected to qualify for a visa under the diversity visa program cannot be issued a visa after midnight of the final day of the fiscal year for which they were selected"); *accord Mohamed v. Gonzales*, 436 F.3d 79, 80–81 (2d Cir. 2006); *Carrillo–Gonzalez v. INS*, 353 F.3d 1077, 1079 (9th Cir. 2003); *Iddir v. INS*, 301 F.3d 492, 500–01 (7th Cir. 2002).

11

unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).  Modern statutes, apart from the specific deadline directly at issue here, point in the same direction.  For one thing, Congress has made decisions by consular officers to deny visas to aliens outside the United States not reviewable even by the Secretary of State.  6 U.S.C. § 236(b)(1).  For another, while Congress has provided for judicial review of the removal of aliens present in the United States, 8 U.S.C. § 1252, it has expressly refused to afford judicial review for aliens outside the country "to challenge a decision of a consular officer … to grant or deny a visa."  6 U.S.C. § 236(f).  This general framework, plus the sensitivities noted above, undercut any contention that courts may order the processing and issuance of visas to aliens whom Congress has specifically made ineligible.

In sum, the statutory deadline is clear, and neither history nor context affords any basis for departing from it.  The district courts had no authority to order the State Department to keep processing applications for diversity visas and issuing the visas beyond the end of the relevant fiscal years.[3]

C

The plaintiffs make several arguments in defense of the remedial orders, but none of them is convincing.

---

[3] Before this Court, the government no longer presses an argument that the doctrine of consular non-reviewability bars judicial review in this case.  *Cf. Saavedra Bruno*, 197 F.3d at 1159–62.  Accordingly, we do not consider that question.

12

1. The plaintiffs seek to distinguish *Pangilinan* as a case involving the conferral of citizenship, not the processing and issuance of visas. It is true, as this Court once observed, that the conferral of citizenship was the "only form of relief specifically disapproved" in *Pangilinan*. *In re Thornburgh*, 869 F.2d 1503, 1517 (D.C. Cir. 1989). But the Supreme Court reasoned more generally; its decision rested on the broad principle that "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Pangilinan*, 486 U.S. at 883 (quoting *Hedges*, 150 U.S. at 192). Moreover, the rule that equitable relief cannot violate statutes is amply supported by other cases outside the citizenship and immigration context. *See*, *e.g.*, *United States v. Oakland Cannabis Buyers' Coop*, 532 U.S. 483, 497 (2001) ("a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation" (cleaned up)); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (Congress may "guide or control the exercise of the courts' [remedial] discretion"). Furthermore, while the district courts here did not order the granting of diversity visas to any individual alien or group of aliens, the *Gomez* court did order continued processing of visa applications "until all 9,905 [reserved] diversity visas have been granted." *Gomez III*, 2021 WL 3663535, at *24. This order—entered on the last day of the fiscal year—necessarily required the Secretary to violate an unqualified statutory deadline, which Congress imposed in a context where courts owe a high degree of respect to the judgments of the political branches.

2. The plaintiffs invoke *Almaqrami v. Pompeo*, 933 F.3d 774 (D.C. Cir. 2019). In that case, selectees for fiscal year 2017 sought diversity visas despite a presidential proclamation barring their entry into the United States. *Id.* at 777–78. On September 29, 2017, the district court ordered the State Department to reserve unused FY 2017 diversity visas so that

13

the Department could process pending applications and issue visas if the Supreme Court were to invalidate the proclamation. *Id.* at 778. After the end of the fiscal year, the proclamation expired, and the Supreme Court held that challenges to it were moot. *See id.* at 779. The district court then dismissed the claims for the diversity visas as moot, and the plaintiffs appealed. *Id.*

In this Court, the government argued for mootness on the ground that, once the plaintiffs lost their eligibility for diversity visas at the end of the fiscal year, the courts could no longer afford any meaningful relief. *Almaqrami*, 933 F.3d at 780. We held that the case did not become moot on that basis. We explained that arguments about "the legal availability of a certain kind of relief" go to the merits—not mootness—unless the remedy is "so implausible that it is insufficient to preserve jurisdiction." *Id.* at 781 (cleaned up). We noted two cases where district courts had "invoked [an] equitable power to enforce prior orders and instructed the government to issue the plaintiffs [diversity] visas even though the selection FY had ended." *Id.* at 780. Given those cases, we held that the claim for relief remained at least plausible enough to support Article III jurisdiction. *See id.* at 782. We therefore remanded for the district court to consider the merits. *Id.* at 784.

Our decision does not help the plaintiffs. We held only that the validity of a visa-reservation remedy was not so implausible as to moot a pending case. We did not decide the merits question whether district courts may order such a remedy despite the clear eligibility cutoff at the end of the fiscal year. Now, we decide that question in the negative.

3. The plaintiffs also cite the district-court decisions ordering the government to process diversity-visa applications and issue the visas after the year-end deadline. *See*

14

*Przhebelskaya v. USCIS*, 338 F. Supp. 2d 399, 403–06 (E.D.N.Y. 2004); *Paunescu v. INS*, 76 F. Supp. 2d 896, 902–03 (N.D. Ill. 1999). These decisions reason that courts may extend the eligibility deadline so long as they act before the deadline has run. But we fail to see how the timing of a court order can matter, for the deadline is keyed to receipt of a visa: In unambiguous and unqualified terms, Congress provided that diversity-visa selectees "shall remain eligible to *receive* such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(*I*)(ii)(II) (emphasis added). Thus, it does not matter whether a selectee has submitted the required documents, filed a lawsuit, obtained some form of preliminary relief, or done anything else short of receiving the visa; at the end of the fiscal year, "those applicants without visas are out of luck." *Yung-Kai Lu*, 292 F. Supp. 3d at 282.

    4. In *Gomez*, the district court analogized to the courts' power to make government funds available beyond the end of the relevant appropriation. *Gomez II*, 490 F. Supp. 3d at 285–86. We have held that a court may "award funds based on an appropriation even after the date when the appropriation lapses, so long as the lawsuit was instituted on or before that date." *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (cleaned up). Our decisions in this area trace back to an assertion that courts may "suspend the operation of a lapse provision" because their equitable powers "allow them to take action to preserve the status quo of a dispute and to protect their ability to decide a case properly before them." *Nat'l Ass'n of Reg'l Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977). But in the appropriations context, Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out. *See* 31 U.S.C. § 1502(b) ("A provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a

15

definite period does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance."). This authority has existed at least since 1973. *See* Pub. L. No. 97–258, § 1502(b), 96 Stat. 877, 928 (1982); Pub. L. No. 93-52, § 111, 87 Stat. 130, 134 (1973). Here, in contrast, Congress gave the courts no analogous authority to suspend visa-eligibility deadlines to accommodate pending lawsuits, instead imposing an unqualified prohibition on the issuance of visas past the deadline.

We recognize that our appropriations cases, which originated in the mid-1970s, assert an equitable authority unmoored from section 1502(b) or its antecedents. *See*, *e.g.*, *Nat'l Ass'n of Reg'l Councils*, 564 F.2d at 588–89; *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 55–57 (D.C. Cir. 1977). But this reasoning provides thin support for the plaintiffs' position. These cases were decided during the "*ancien regime*" when courts took a much more freewheeling approach to the law of remedies. *See Ziglar v. Abbasi*, 582 U.S. 120, 131–32 (2017); *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). Since then, the Supreme Court repeatedly has stressed the limits on the federal courts' equitable powers in cases like *Pangilinan*, *Grupo Mexicano*, and *Oakland Cannabis*. And this more recent guidance indicates that a court may not override clear statutory limits on visa eligibility without some other statutory authority—akin to section 1502(b)—for doing so.

5. The plaintiffs object that agency delay should not frustrate their interest in obtaining diversity visas. Yet the plaintiffs have nothing resembling a substantive entitlement to such visas. Congress has imposed a ceiling, but not a floor, on the number of diversity visas to be issued each fiscal year. *See* 8 U.S.C. § 1151(a)(3), (e). Selectees still must complete the process of applying for an immigrant visa, *see* 22 C.F.R. §§ 40.1(*l*)(2), 42.33(g), and must satisfy all admissibility

requirements, *see* 8 U.S.C. § 1182(a). They must compete with other selectees for the limited number of visas: In fiscal year 2020, the Department chose over 90,000 selectees (including derivative beneficiaries) to compete for the 55,000 available visas. J.A. 2353–54. In fiscal year 2021, the Department chose over 137,000 selectees and beneficiaries. *Id.* The selectees also must obtain a visa before the end of the fiscal year. 8 U.S.C. § 1154(a)(1)(*I*)(ii)(II). On the other hand, decisions regarding the prioritization and processing of visa applications—like decisions regarding the issuance or denial of visas—implicate weighty concerns of foreign policy and national security. *See Harisiades*, 342 U.S. at 588–89; *Knauff*, 340 U.S. at 543. Given all of this, we find it neither surprising nor concerning that Congress left administration of the diversity-visa program primarily in the hands of the Executive Branch. And we see no basis for judges to invoke equity to override the temporal or other limitations that Congress has expressly built into the diversity-visa program.[4]

In a slight variation on this theme, the plaintiffs raise a specter that enforcement of the statutory deadline would enable the government "to avoid the full impact of court orders by simply dragging its feet." Joint Brief for Plaintiffs-Appellees at 83, *Goodluck v. Biden*, No. 21-5263 (June 9, 2022). But the initial injunction in this case, entered before the end of the

---

[4] The diversity-visa program is unlike the visa program at issue in *Afghan & Iraqi Allies v. Blinken*, No. 23-5025 (D.C. Cir. June 7, 2024). There, instead of imposing a firm deadline by which applicants had to obtain their visas, Congress imposed a presumptive deadline by which the State Department had to adjudicate the relevant visa applications. *See id.*, slip op. at 3–4. We relied in significant part on that deadline in affirming a decision regarding unreasonable agency delay. *See id.*, slip op. at 13–14. In both cases, our decisions respect Congress's judgment about the adjudication of visa applications.

17

relevant fiscal year, merely required the government to "undertake good-faith efforts" to process diversity-visa applications "expeditiously" and until the end of the fiscal year. *Gomez I*, 485 F. Supp. 3d at 205. The plaintiffs here do not contend that the government violated that obligation, much less that they did so willfully. Accordingly, we need not consider whether, if there were such a case of bad faith or undue delay in complying with a timely entered injunction, the district court could issue contempt sanctions against the government even if it could not grant relief directly to visa applicants past the end of the fiscal year.[5]

### III

Once Fiscal Years 2020 and 2021 ended, the plaintiffs lost their eligibility for diversity visas. The district courts erred in asserting an equitable authority to override these clear statutory deadlines, which foreclose the prospective relief sought in these cases. Accordingly, we reverse the remedial orders challenged by the government, reject the *Goh* cross-appeal, and remand the cases with instructions to enter judgment for the government.

*So ordered.*

---

[5] Our holding that the district courts had no remedial authority to order the government to process visa applications and grant visas after the statutory deadlines disposes of the *Goh* plaintiffs' argument on cross-appeal that the district court there reserved too few visas.